IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CASSANDRA M. MENOKEN, Esquire | ) | |
| 131 Tennessee Avenue NE | ) | |
| Washington, D. C. 20002 | ) | |
| | ) | |
| Plaintiff | ) | Civil Action No: |
| v. | ) | |
| | ) | |
| JENNY R. YANG, Chair, UNITED STATES | ) | Jury Trial Demanded |
| EQUAL EMPLOYMENT OPPORTUNITY | ) | |
| COMMISSION in her official capacity as | ) | |
| well as her successors and assigns | ) | |
| 131 M Street NE | ) | |
| Washington, D.C. 20507 | ) | |
| _____ | ) | |

**COMPLAINT**

PRELIMINARY STATEMENT

1.      Plaintiff Cassandra M. Menoken brings this action pursuant to Title VII of the

Civil Rights Act of 1964, as amended, and the Rehabilitation Act of 1973, as amended.  The

action arises from a sustained pattern of unethical and abusive conduct committed by Plaintiff's

employer, the United States Equal Employment Opportunity Commission (EEOC). The conduct

has persisted for more than 15 years and is rooted in EEOC's demonstrable hostility towards

Plaintiff's exercise of her right to pursue discrimination and retaliation claims against the United

States Office of Personnel Management (OPM). The hostility magnified after Plaintiff reported

agency abuses to the EEOC Chair's Office in 2012.

2.      Plaintiff seeks a declaratory order, a permanent injunction and such legal and

equitable relief as determined to be warranted to rectify the past, and lingering, effects of the

EEOC's outrageous behavior.

JURISDICTION AND VENUE

3. This action is authorized by 42 U.S.C. § 2000e-16(c), 29 U.S.C. § 794(a) and 42 U.S.C. § 1981a. The Court has jurisdiction under 28 U.S.C. §1331. All alleged unlawful acts were committed in the District of Columbia. Venue is thus proper under 28 U.S.C. §1391(b).

PARTIES

4.       Plaintiff Cassandra M. Menoken, a resident of the District of Columbia, is employed as an attorney with the EEOC. She has worked there for more than 35 years.

5.       Defendant Jenny R. Yang is Chair and administrative head of the EEOC, an agency of the federal government headquartered in Washington, D.C.  The EEOC is charged with enforcing federal laws proscribing discrimination in employment. In the federal sector, it provides policy guidance and oversight with regard to the government's obligation, as an employer, to maintain a work place "free from" unlawful discrimination. The EEOC also renders final adjudications on discrimination claims filed by federal employees against their agencies. As a matter of preference -- not law -- it also renders final adjudications on claims filed by EEOC employees against the EEOC.

ADMINISTRATIVE EXHAUSTION

***SUMMARY OF PLAINTIFF'S FORAYS INTO
THE ETHICAL MORASS OF EEOC'S PROCEDURES***

6.       In early 2012, Plaintiff participated in a series of informal meetings with EEOC Chief Operating Officer (COO) Claudia A. Withers.  The meetings were arranged by EEOC's Chief Mediator to facilitate discussion of concerns Plaintiff had raised regarding the process put into place to adjudicate pending appeals associated with claims Plaintiff had filed against OPM in 1994. The contentious nature of the 1994 matter led to retaliation complaints in 2001 and 2005. Appeals emanating from Plaintiff's 2001 and 2005 complaints were pending before EEOC in 2012.

7.      During the 2012 meetings, Plaintiff related to COO Withers her concern that certain colleagues involved in her pending appeals may have a vested interest in their outcome due to their suspected involvement in earlier OPM appeals. Plaintiff noted that EEOC's processing of her earlier appeals had been tainted by unethical conduct that included (but was not limited to) engaging in *ex parte* contact with OPM while the appeals were pending.  Plaintiff advised that OPM had acknowledged at least one such contact, in 2008, and she had strong reason to believe there were others.

8.      Plaintiff reported that OPM had suspiciously objected when she demanded full disclosure of the content and frequency of its interactions with EEOC.  OPM took the position that its *ex parte* communications regarding Plaintiff's appeals were protected by "privilege."

9.      Plaintiff further explained to COO Withers that the reason she undertook to contact the Chair's Office was that she had been unsuccessful in her effort to raise her "conflict of interest" concerns *via* the appeal process. She had filed a formal motion seeking assurances her appeals were not at risk of being compromise, but the motion had not been acknowledged by EEOC in two years. Plaintiff believed it appropriate that the Chair inquire into the matter in her capacity as EEOC's "Chief Ethics Officer."

10.     Plaintiff also raised employment concerns with COO Withers.  She noted that, based on information obtained through discovery in the 1994 OPM case, she had reason to believe EEOC and OPM had discussed Plaintiff's work activities while her earlier appeals were pending. She further noted her belief that EEOC had agreed to monitor Plaintiff's activities to accommodate OPM's desire that Plaintiff not be involved in any matter in which OPM *may* have an interest, whether as a party, or a nonparty witness, or as the human resources entity for the federal government.  Plaintiff advised COO Withers that, by entering into such an agreement, without her

knowledge or input, EEOC had inappropriately "linked" Plaintiff's EEOC employment to her

protected activity against OPM.  As a result, Plaintiff believed that, given her job duties, the Chair's

Office should arrange for her to be reassigned, at least temporarily. Plaintiff further believed that

special measures should be undertaken to ensure her appeals would be impartially processed.

Plaintiff explained to COO Withers that immediate action was warranted because the "link" EEOC

had created had taken a toll on her health.  COO Withers was aware that Plaintiff was being treated

for severe hypertension, clinical depression, acute anxiety and "complex" PTSD.

      11.    The informal discussions with COO Withers ended in April 2012 with Plaintiff

feeling cautiously optimistic that her "ethics" and "workplace" concerns would be addressed in

some way. Plaintiff was naïve.  In the weeks and months that followed, it became increasingly

clear that COO Withers had never intended to address Plaintiff's concerns and was less than

pleased that Plaintiff had raised them.  By the end of November 2012, a message had radiated

throughout EEOC headquarters that Plaintiff was no longer to be treated as a loyal employee to be

valued, but as a potential adversary to be neutralized.  The stage was thus set for what would soon

become a formal proceeding.

      12.    On December 27, 2012, Plaintiff commenced administrative steps to pursue

claims against EEOC by contacting the Office of Equal Opportunity (OEO), per 29 C.F.R §

1614.105, to request consultation with an EEO Counselor. Pursuant to the consultation, the

Counselor conducted a "limited" factual inquiry into Plaintiff's concerns, and thereafter notified

Plaintiff of her right to file a formal complaint.

      13.    On February 6, 2013, Plaintiff filed a formal complaint asserting claims fairly

summarized as follows: 1) EEOC violated Title VII by subjecting Plaintiff to a persistent pattern

of adverse treatment and hostility rooted in its antagonism toward Plaintiff's protected activity

against OPM; and 2) EEOC violated the Rehabilitation Act by failing to honor and respect

Plaintiff's *unconditional* right to a reasonable accommodation for her disabilities where no undue

hardship exists.  OEO docketed Plaintiff's complaint as No. 2013-0010 and "accepted" it for

investigation.

14.     EEOC's investigation of Complaint No. 2013-0010 failed to comply with

EEOC's own regulation at 29 C.F.R. § 1614.108.  EEOC penalizes *other* agencies when they

disregard EEOC's regulations, but, has never held itself to the same standard of accountability.

15.     EEOC's OEO failed to act in accordance with its duty to ensure that Complaint

No. 2013-0010 would be investigated in a fair and appropriate manner; instead, it acted

otherwise.  Organizationally, the OEO Director reports to the EEOC Chair through the COO,

who, at the time, was Ms. Withers.

16.     OEO interfered with an independent investigator's good faith efforts to develop an

impartial factual record.  Relevant EEOC witnesses were told they need not cooperate with the

investigator's inquiries.  Notably, the investigation failed to include any statement from COO

Withers, whose actions Plaintiff had squarely called into question.

17.     EEOC's internal "exhaustion" procedures reflect EEOC's policy of not holding

itself to the integrity standard to which EEOC holds the rest of the federal government; evincing

the attitude "Do as I say, not as I do."

18.     The investigation of Complaint No. 2013-0010 was not completed within the time

frame required by EEOC's regulation at 29 C.F.R. 1614.108 (f).  Plaintiff exercised her right to

proceed to the hearing stage upon realizing the investigation had stalled at 290 days due to

EEOC's failure to cooperate with the independent investigator.

19.     After being advised of Plaintiff's decision to move Complaint 2013-0010 to the

hearing stage, OEO *altered* the record to create an impression that the gross deficiencies in the

investigation were the fault of the investigator – not EEOC. Documents facially reflecting

EEOC's noncooperation with the independent investigator were *removed* from Plaintiff's "copy"

of the investigative file -- a clear violation of law. See 18 U.S.C. §1519.  .

20.     On September 26, 2014, Plaintiff filed EEO Complaint No. 2014-0039 asserting

that EEOC had unlawfully arranged for a stranger, not employed by the government, to access

confidential medical information in Plaintiff's workers' compensation file. Plaintiff complained

about EEOC's abuse in this regard to a workers' compensation hearing officer. The hearing officer

asked EEOC to explain its actions, but EEOC made no effort to do so; it simply continued to

access Plaintiff's medical records, in blatant disregard of her Rehabilitation Act rights.

21.     In or around December 2014, EEOC consolidated Complaints 2013-0010 and

2014-0039 and arranged for them to be adjudicated by "Administrative Judge" Jonathan

Kaufmann. Mr. Kaufmann was actually a private attorney who was being paid by EEOC.

22.     AJ Kaufmann denied, in summary fashion, Plaintiff's request for the participation

of a government ethics specialist to provide insight on issues relevant to EEOC's handling of

Plaintiff's OPM appeals.  AJ Kaufmann also denied, in summary fashion, Plaintiff's request for

relief in the wake of evidence documenting OEO's abuses in Complaint 2013-0010.  In the end,

AJ Kaufmann saw no need to bother with a hearing. As a result, he completed his paid

assignment by entering summary judgment for EEOC.

23.     Under the EEOC rules that govern hearings for employees of every other federal

agency, claims are adjudicated by a randomly assigned EEOC AJ with no ties of *any* kind to

either party. EEOC employees are the only federal employees forced to submit their hearing

claims to a *handpicked* private attorney-- paid by EEOC.

24.     Other agencies bound by employment laws that they enforce or administer have

special procedures for their own employees to ensure neutrality in appearance and actual

practice.  Employees of these agencies are not burdened by issues of impartiality and

independence when they undertake to pursue their rights.  EEOC has a special procedure for its

employees as well, except EEOC's procedures are designed, in appearance and practice, to

minimize EEOC's risk of legal exposure.

25.     By letter postmarked September 19, 2016, EEOC notified Plaintiff of its "final

order" adopting its "contract" AJ's summary dismissal of Complaints 2013-0010 and 2014-0039.

26.     Plaintiff received EEOC's final order on September 22, 2016.

27.     Plaintiff could have filed an administrative appeal, but did not. An appeal would

have been futile because of the conflicts *embedded* in EEOC's internal appeal process.

28      In deciding to forego an administrative appeal, Plaintiff was also mindful of the

way EEOC had handled her OPM matters.

FACTUAL BACKGROUND

*PLANTIFF'S EEOC EMPLOYMENT*

29.     Plaintiff is a GS-15 Attorney who has worked for EEOC in multiple capacities for

over 35 years.

30.     Until 2012, Plaintiff's performance had been rated "outstanding" since 1982.

31.     For reasons never explained, Plaintiff was not given a performance rating in Fiscal

Year 2012.  All other eligible employees were given ratings that year.  The decision to treat

Plaintiff differently in 2012 was made or approved by the EEOC COO.

32.     Until 2012, Plaintiff had been recognized, within and outside of EEOC, for her sustained commitment to excellence, as well as her expertise in discrimination law and procedure, particularly in the federal sector context.

33.     At times material hereto, Plaintiff functioned as a Senior Legal Advisor in the EEOC's Office of Federal Operations (OFO).  OFO is the program responsible for (among other things) processing appeals from administrative decisions on the discrimination complaints of federal employees and applicants.  OFO's appellate processing results in "final" adjudications by, or on behalf of, the Commission as a body.

34.     As an OFO Senior Legal Advisor, Plaintiff's responsibilities focused on providing legal and policy advice on matters relating to OFO's adjudicatory activities.

35     Plaintiff's OFO responsibilities also included providing legal and policy advice, as request or warranted, with respect to the related activities of other EEOC headquarters offices, such as the Offices of General Counsel, Legal Counsel and Field Programs (OGC, OLC and OFP). Plaintiff's work activities routinely required interacting on policy related matters with officials and staff in OGC, OLC and OFP (and others).

36.     Since 2012, for reasons unrelated to the quality of her work, Plaintiff's status and level of responsibility have been greatly diminished by EEOC.

### *PROTECTED ACTIVITY INVOLVING OPM*

37.     In 1994, Plaintiff initiated EEO proceedings to challenge systemic race and gender discrimination in the federal Administrative Law Judge (ALJ) program. The 1994 proceeding is referred to herein (and elsewhere in the administrative record) as the "Menoken I" matter.

38.     ALJs occupy "senior pay" level positions and enjoy lifetime tenure and independence in their federal employment. The Menoken I claims were asserted against OPM

8

because of its lead role in the ALJ program.  Although OPM does not employ ALJs, it controls the

appointment process and generally functions as the "gatekeeper" for about 30 agencies that do.

39.     The Menoken I EEO complaint challenged the design and administration of the

"1993" ALJ selection process, which included (but was not limited to) the examination that

OPM "opened" in March of that year.  In the complaint, Plaintiff asserted (among other things)

that the selection process had long been riddled with barriers to equal opportunity for qualified

African American and female applicants (like her). When she applied, in 1993, over 90% of the

ALJs in the government were white males.  All women and all minorities *combined* made up *less*

than 10% of federal ALJs.  It had been that way (or worse) for almost 50 years.

## EEOC's Processing of the Menoken I Complaint at the Hearing Stage

40.     EEOC's regulations afford every complainant a right to request a hearing before

an EEOC AJ. Pursuant to that right, Plaintiff requested a hearing on the Menoken I claims in or

around May of 1995.  Clearly mindful (at least at *that* time) of the need to avoid potential

"conflict of interest" concerns, or any appearance thereof, EEOC arranged for an individual,

outside of EEOC, to preside over a hearing, which took place in March 2000.

41.     The outcome of the Menoken I hearing was "mixed."  Although the designated AJ

rejected (or failed to address) most of Plaintiff's arguments, he credited one argument that was

sufficient to establish liability under Title VII.

42.     The Menoken I AJ ruled  OPM had discriminated against African American ALJ

applicants by relying on an invalid examination scoring practice that unlawfully correlated with

race. The practice operated as an unnecessary barrier to the ability of African American

applicants to be fairly scored on the ALJ examination, where a differential of **1/100th of a point**

could determine whether an applicant could be considered for an appointment (or not).

43.     The AJ's finding led to a remedial order in June 2001.  The order directed OPM to "cease" and correct its discrimination against African American ALJ applicants. OPM was also required to refrain from allowing appointments from the ALJ register until corrective steps had been taken with respect to examination scores. EEOC later acknowledged that "correcting" OPM's discrimination required an increase in the scores of African Americans on the ALJ Register (to include Plaintiff's).   After OPM took "final action," per 29 C.F.R. § 1614.110 (a), Plaintiff promptly appealed to EEOC.

### EEOC's Hostile and Unethical Processing of Menoken I  Appeals

44.     Plaintiff filed two appeals with EEOC; one challenging the Menoken I AJ's erroneous rulings and non-rulings on issues of law and fact (the "merits" appeal); the other, seeking EEOC's enforcement of the AJ's remedial order (the "compliance" appeal).  OPM had violated the order immediately after the outside AJ exited the case.

45.     Plaintiff's compliance and merits appeals were filed in August and September 2001 (respectively).  Soon thereafter, EEOC *sua sponte* issued a notice advising of a decision to arrange for special handling.  The decision was directed or approved by the Chair's Office.

46.     EEOC's notice informed Plaintiff and OPM that the Menoken I appeals had been assigned for processing to Reuben Daniels, Director of EEOC's District Office in North Carolina.

47.     Not long after her appeals were referred to Mr. Daniels, Plaintiff began to sense a subtle shift in her work environment.  She also began hearing rumors that EEOC and OPM had been communicating about Plaintiff's appeals.  Several years later, the accuracy of the rumors was confirmed when, in response to a discovery request in the Menoken I court proceeding, OPM produced a "privilege log" acknowledging its *ex parte* contact with EEOC.

48.     OPM refused to disclose the content of its communications with EEOC on the asserted ground of "privilege."

49.     EEOC dismissed the Menoken I appeals on facially suspicious grounds in May 2003 at which time Plaintiff undertook an internal inquiry into how the appeals had been handled. The inquiry confirmed Plaintiff's suspicion that Daniels had arranged for her merits appeal to be adjudicated as *lacking* merit without ever reviewing the administrative record which remained in headquarters the entire time of his Menoken I assignment.   To date, EEOC has not denied Plaintiff's repeated assertion that Mr. Daniels arranged for the Menoken I merits appeal to be dismissed absent any review of the underlying record.

50.     With regard to Plaintiff's compliance appeal, EEOC further ruled in its May 2003 decision, that EEOC was "reasonably satisfied"  OPM had complied with the Menoken I AJ's remedial order.  Plaintiff did not need to conduct an inquiry to know *that* ruling had no basis. As of May 2003, no one from EEOC had directed OPM to submit evidence of its compliance, per EEOC's standard practice in other compliance appeals.

51.     Once it became widely known within EEOC that Plaintiff could establish, with certainty, that her OPM appeals had been "fixed," officials and staff in headquarters  (including the "colleagues" with whom she worked) slowly began to "close ranks."

52.     In the ensuing years, Plaintiff's work environment became increasingly uncomfortable as a result of her continued efforts to pursue Menoken I *related* matters in EEOC's process.  It did not help that Plaintiff repeatedly insisted that such matters be processed ethically.

53.     After Plaintiff's encounter with COO Withers in 2012, EEOC's message became loud and clear: *there will be no special arrangement for pending Menoken I related appeals (as was done for Menoken I); to the extent Plaintiff persists in bringing her OPM matters to EEOC,*

*she does so at her peril; and all Menoken matters will be monitored and controlled by officials in*

*OFO, OFP, OLC and OGC whose assigned mission will be to protect OPM and EEOC.*

### Plaintiff's Working Conditions Slowly Became Intolerable

54.    EEOC's antagonism towards Plaintiff's pursuit of her OPM claims hovered like a "dark cloud" over Plaintiff's working environment for many years; causing stress and complicating her ability to function at the level she was expected to perform. The hostile and secretive nature of Plaintiff's day to day environment was made worse when EEOC randomly used its leverage as her employer to facilitate OPM's retaliatory abuses.  For example:

55.    In or around 2002, *while Plaintiff's OPM claims were pending adjudication*, EEOC an OPM reached an *ex parte* understanding that EEOC would accommodate OPM's demand that Plaintiff's work activities be monitored.

56.    In 2006, *while Plaintiff's OPM claims were pending adjudication*, EEOC joined forces with OPM to coerce Plaintiff into "authorizing" OPM to arrange an FBI investigation into Plaintiff's "suitability" for federal employment.

57.    In 2007, *while Plaintiff's OPM claims were pending adjudication,* EEOC joined forces with OPM to attempt to induce Plaintiff to retire under the belief that her OFO position was slated for elimination.  It was a ploy to limit the monetary impact of OPM's potential exposure.

### Retaliatory Abuses Designed To Force Plaintiff To Leave

58.    On or about September 11, 2012, Plaintiff submitted a formal request for a reasonable accommodation to EEOC's Disability Program Manager.

59.    EEOC's Disability Program is housed in the Office of the Chief Human Capital Officer (hereafter "HR" for simplicity).

60.     Upon learning that Plaintiff had requested a reasonable accommodation COO Withers contacted Lisa Williams, the HR Director, and instructed her to hold off on processing Plaintiff's request until further notice.

61.     Although Plaintiff was aware her accommodation request was not being timely processed, four months would go by before she would learn that COO Withers had actually ordered that processing be delayed.

62.     In November 2012, COO Withers arranged for EEOC's Chief Mediator to present Plaintiff a proposal offering to "grant" Plaintiff's reasonable accommodation request on the condition that Plaintiff execute a "general release" absolving EEOC from liability with respect to any claims arising from her employment.  At the time, no "claims" had been filed by Plaintiff.

63.     Plaintiff was offended by COO Withers' outrageous and unlawful attempt to take advantage of her weakened state, and desperate need for a reasonable accommodation, to extract legal concessions to benefit EEOC.

64.     Convinced at that point that EEOC had no intentions of processing Plaintiff's reasonable accommodation request in good faith, Plaintiff filed an occupational injury claim with the Office of Workers' Compensation Programs.  She then went on extended leave to await the outcome, with the intent of using a combination of paid leave and leave without pay (LWOP).

65.     For reasons never explained, in or around February 2013, Plaintiff's supervisor Carlton Hadden stopped acting on Plaintiff's LWOP requests. He would not approve or deny the requests; he would simply ignore them. Mr. Hadden had also stopped "certifying" Plaintiff's time to payroll, which had the effect of preventing Plaintiff from being compensated for the "paid" leave requests she had submitted.

66.     The Interior Business Center (IBC) is the entity that handles "payroll" matters for

EEOC.  IBC alerted Plaintiff in mid-2012 of worrisome anomalies in her account.  The anomalies

arose from EEOC's protracted failure to certify Plaintiff's time to IBC.  IBC warned there could

be adverse consequences for Plaintiff if the situation were not corrected as soon as possible.

Plaintiff was strongly urged to sensitize EEOC to the importance of acting on leave requests and

confirming an employee's status by accounting for time on a biweekly basis.

67.     Alarmed by IBC's warning, on June 7, 2013, Plaintiff sent an email to Lisa

Williams and Carlton Hadden, referencing her conversation with IBC, and asking that Plaintiff 's

payroll records be promptly corrected and that her status be appropriately accounted for going

forward. Ms. Williams and Mr. Hadden did not respond to or acknowledg Plaintiff's email.

68.     On October 28, 2013, Plaintiff received a letter from GEHA, her health insurance

carrier.  The letter advised that Plaintiff had been "disenrolled" from her policy and that her benefits

had been suspended.  It further advised that her benefits would be terminated, retroactively, unless

Plaintiff could prove an error had been made. No further details were provided.

69.      Plaintiff immediately called GEHA to advise of her belief that any problem was

likely attributable to EEOC's mishandling of her leave records.  The representative advised that,

unless prompt action was taken to correct the matter, she would have to effectuate the termination.

70.     Immediately after hanging up, Plaintiff sent an email to Ms. Williams and Mr.

Hadden attaching a copy of the GEHA letter.  She, again, asked about EEOC's intentions with

regard to straightening out her payroll records.  She specifically asked for a response "right away."

Once again, Ms. Williams and Mr. Hadden chose not to acknowledge Plaintiff's email.

71.     About a week later, Plaintiff was notified by GEHA that her insurance had been

reinstated, but, when asked, the representative acknowledged she did not know what had been

done to get the issue resolved.  She also told Plaintiff she could not be certain the issue would not resurface during the next "reconciliation" cycle.

72.     EEOC went out of its way to harm Plaintiff in order to induce her departure.  After the 2013 government shutdown was over, and Congress authorized employees to be paid, Plaintiff, who had been in pay status when the shutdown began, prepared and submitted her time sheet using the pay codes enabling her to be paid for the shutdown period.

73.     Plaintiff was not, however, paid for the shutdown period because an EEOC timekeeper was instructed to go into Plaintiff's personal account and unilaterally *change* the "pay" codes Plaintiff had entered to codes corresponding to "leave without pay" (LWOP).

74.     Plaintiff vigorously protested the unauthorized "hijacking" of her payroll account and demanded an explanation from Mr. Hadden. He provided no explanation or justification but simply noted that the changed codes correctly corresponded to LWOP. It was at that point that Plaintiff decided she needed to leave EEOC.

75.     In early 2014, Plaintiff began working on her retirement application, with an eye toward separating no later than the end of May.   After her papers were finalized, and she was scheduled to depart in two weeks, Plaintiff undertook to satisfy debts owed to the government as a result of her extended LWOP.

76.     When Plaintiff sought guidance on the procedure for paying government debts, she was told to contact EEOC payroll specialist Tonya Palmer. Ms. Palmer, however, would not respond to Plaintiff's emails and phone messages.

77.     Upon realizing no one in EEOC was willing to help her, Plaintiff called IBC for guidance on the procedure for satisfying government debts.  It was at that time Plaintiff learned

that EEOC had never clarified her payroll records and that, as a result Plaintiff was at risk of losing her health insurance.

78.     The conversation with IBC caused Plaintiff to promptly cancel her retirement and return to work in June 2014 -- against her doctor's advice.

79.     Immediately upon returning to work, Plaintiff demanded that EEOC take steps to clarify her employment records.  To date, EEOC has not done so.  After initially insisting that Plaintiff's records have always been clear and correct, EEOC undertook to insert erroneous information into Plaintiff's "Official Personnel Folder" to mask its prior abuses, in the hope that Plaintiff would immediately move forward with her departure.  Although EEOC's plan did not work as expected, it did succeed in creating a "catch 22" it believes will eventually produce the same desired effect.

### *PLAINTIFF'S LEGAL INJURIES*

80.     At all times relevant to this action, Plaintiff has experienced pain, suffering, embarrassment, and other emotional trauma, arising from Defendant's unlawful conduct.

### FIRST CAUSE OF ACTION

Plaintiff incorporates paragraphs 1 through 80, as applicable, and asserts that Defendant violated Title VII by subjecting Plaintiff to a hostile work environment because of Plaintiff's protected activity against OPM an EEOC.

### SECOND CAUSE OF ACTION

Plaintiff incorporates paragraphs 1 through 80, as applicable, and asserts that Defendant violated the Rehabilitation Act by interfering, in a retaliatory manner, with Plaintiff's efforts to exercise her rights under the Act and refusing to provide Plaintiff a reasonable accommodation.

Defendant also violated the Act by unlawfully monitoring, and making public, Plaintiff's confidential medical information.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and award the following relief:

(i)     a declaratory order stating that, at all times relevant to this action, Defendant has acted unlawfully and maliciously towards Plaintiff;

(ii)    an injunctive order directing EEOC to immediately correct all inaccuracies, discrepancies and ambiguities in Plaintiff's payroll and personnel records;

(iii)   an order permanently enjoining EEOC from attempting to harm Plaintiff in the future because of prior or future protected activity;

(iv)    an order awarding Plaintiff back pay and (as applicable) front pay

(v)     damages to the maximum extent allowable for Plaintiff's emotional injuries; and

(vi)    such other legal and equitable relief as may be warranted under the circumstances.

JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

Respectfully submitted,

*/s/*
Gary T. Brown, Esquire
D.C. Bar No. 246314
GARY T. BROWN & ASSOCIATES
1050 17th Street NW, Suite 1000
Washington, D.C. 20036
Tele: (202) 393-4900
Fax:  202.360.4617
GTBFirm@GaryTBrown.com