IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CASSANDRA M. MENOKEN, Esquire | ) | |
| | ) | |
| Plaintiff | ) | |
| v. | ) | |
| | ) | Civil Action No:  1:16-cv-02480 (DLF) |
| CHARLOTTE A. BURROWS, Chair, | ) | |
| UNITED STATES EQUAL EMPLOYMENT | ) | Jury Trial Demanded |
| OPPORTUNITY COMMISSION, | ) | |
| | ) | **[CORRECTED 11/7/2021]** |
| Defendant. | ) | |
| _____ | ) | |

**SECOND AMENDED AND SUPPLEMENTAL COMPLAINT**

<u>PRELIMINARY STATEMENT</u>

***ADOPTION OF APPENDED AMENDED COMPLAINT [DKT 7]***

1.      Plaintiff Cassandra M. Menoken files this Second Amended and Supplemental Complaint and, in so doing, adopts the factual averments set forth in paragraphs 6 through 125 of her Amended Complaint as if each were specifically set forth herein.

2.      On September 15, 2020, the D.C. Circuit entered a judgment reversing the district court's dismissal of this action and ruling -- *in substance and practical effect* -- that the factual averments in the Amended Complaint  plausibly assert that the EEOC violated Plaintiff's rights under Title VII of the Civil Rights Act of 1964 and the Rehabilitation Act of 1973.

3.       The Circuit effectively concluded that the Amended Complaint, *as drafted*, plausibly asserts that EEOC unlawfully subjected Plaintiff to a hostile work environment because of her protected activity under Title VII.

4.      The Amended Complaint avers, *inter alia,* that Plaintiff pursued Title VII claims against OPM in EEOC's adjudicatory process and that EEOC unethically and abusively "linked" Plaintiff's employment to its adjudication of the case in order to accommodate OPM's interests.

5.      The Circuit also concluded that the Amended Complaint, *as drafted*, plausibly asserts that EEOC unlawfully denied Plaintiff a reasonable accommodation.

6.      The Amended Complaint sets forth averments which, if proven, could persuade a reasonable jury that Claudia Withers, EEOC's Chief Operating Officer (COO), was unwilling to reasonably accommodate Plaintiff *unless* she released EEOC from liability with regard to claims arising from her employment, *to include* claims rooted in EEOC's unethical alliance with OPM.

7.       The Circuit further ruled that the Amended Complaint **"as a whole"** plausibly asserts that EEOC interfered with Plaintiff's efforts to exercise Rehabilitation Act rights.

## NATURE OF ACTION

8.      This action asserts claims arising under section 717 of Title VII of the Civil Rights Act and section 501 of the Rehabilitation Act . It was brought against EEOC, Plaintiff's (now former) employer.

9.      Plaintiff's claims arose from a long running pattern of unethical and abusive conduct rooted, *initially*, in EEOC's hostility towards Plaintiff's statutorily protected activity against OPM. That hostility intensified, in and after 2012, in response to protected activity involving EEOC. EEOC's ongoing efforts to harm Plaintiff --"behind the scenes" and in plain sight -- now span more than 20 years and persist to this day.

10.     Plaintiff seeks, *inter alia,* a declaratory order, a permanent injunction, and such legal and equitable relief as may be warranted given the broad and pernicious effects of EEOC's unlawful acts.

11.     EEOC did not just betray this Plaintiff; it betrayed the public trust.

JURISDICTION AND VENUE

12.     This action is authorized by 42 U.S.C. § 2000e-16(c), 29 U.S.C. § 794(a) and 42

U.S.C. § 1981a. The Court has jurisdiction under 28 U.S.C. §1331. All alleged unlawful acts

were committed in the District of Columbia. Venue is thus proper under 28 U.S.C. §1391(b).

PARTIES

13.      Plaintiff Cassandra M. Menoken is a resident of the District of Columbia.  She is

an attorney and former employee of EEOC.

14.     Defendant Charlotte A. Burrows is Chair of the EEOC, an agency of the United

States government headquartered in Washington, D.C.

15.     EEOC is charged with advancing, as well as enforcing, federal laws prohibiting

discrimination and retaliation in employment.

16.      Within the Executive Branch, , EEOC provides policy guidance and oversight

with regard to the federal government's obligations under Title VII, the Rehabilitation Act, the

Age Discrimination in Employment Act, the Equal Pay Act and the Genetic Information

Nondiscrimination Act.

17.     EEOC also functions as an administrative "court" by rendering "final"

adjudications at the appellate level on EEO claims against the federal  government.  EEOC's

"final" orders on liability and relief are legally binding on the government.

18.     With regard to discrimination and retaliation claims filed by **EEOC** employees,

"final" appellate adjudications are rendered through a vote of the sitting Commissioners, with the

Chair of the Commission recused.

19.     Plaintiff herein specifically references paragraphs 26 through 52 of the Amended

Complaint and further avers that EEOC's internal procedure for adjudicating the claims of

EEOC employees -- at the appellate *and* pre-appellate stages -- does not meet the ethics and integrity standards that EEOC requires *other* federal agencies to meet.

ADMINISTRATIVE EXHAUSTION

20.     All claims asserted in this action must be deemed to have been administratively exhausted by virtue of Plaintiff 's good faith efforts to engage with EEOC's Office of Equal Opportunity (OEO) on matters encompassed by the following complaints :

- Complaint No. 2013-0010 (as amended)
- Complaint No. 2014-0039 (as amended)
- Complaint No. 2015-0042 (as amended)
- Complaint No. 2019-0014 (as amended)

21.     Exhaustion must be found *irrespective of whether OEO ever honored Plaintiff's counseling request or acknowledged a formal letter of complaint -- or whether OEO undertook to mislead by **redefining** Plaintiff's claims and issues or otherwise "declined" to process them to the extent they called into question the integrity of EEOC's internal EEO program.*

22.     In a letter -- emailed and faxed on December 11, 2017 -- Plaintiff advised OEO Director Erica White-Dunston as follows:

 [A]t some point, I will test the boundaries of the law to hold EEOC fully accountable for OEO's deliberate failure, under your leadership, to cooperate with my efforts to participate in the EEO process….

23.     By letter postmarked September 19, 2016, EEOC notified Plaintiff of its "final order" on Complaint Nos. 2013-0010 and 2014-0039.

24.      Plaintiff received EEOC's final order on September 22, 2016 and timely filed this civil action on December 20, 2016.

25.     The claims encompassed by Complaint No. 2015-0042 are pending appellate adjudication per an appeal filed by Plaintiff on March 30, 2020.

26.     The claims encompassed by Complaint No. 2019-0014 are pending "agency" level adjudication.  Per EEOC's regulation at 29 C.F.R. § 1614.110(b),  the adjudication should have been rendered *by **April 2, 2021***.

27.      According to the government, Plaintiff's pending administrative claims are being handled in EEOC's Office of Federal Operations (OFO). *See* [33] Part B Defendant's "Meet and Confer Report" at 7 (responding to Plaintiff's request for an order directing EEOC to issue decisions on her pending complaints; noting (irrelevantly) that "trial and agency counsel" cannot "dictate" when **OFO** will "adjudicate" a case).

28.     The staff in OFO work under the direction of Carlton Hadden, the OFO Director.

29.     Hadden is named as an alleged wrongdoer in Plaintiff's administrative complaints.

30.     As a matter of ethics and common sense, it is not appropriate for OFO to play *any* role in Plaintiff's EEO complaints  --least of all one involving an adjudication of their merits.

<u>BACKGROUND</u>

### *SUMMARY OF PLAINTIFF'S EEOC EMPLOYMENT*

31.     At the time this action was filed Plaintiff was a GS-15 Attorney who had worked in various capacities in EEOC headquarters for over 35 years.

32.     Plaintiff's headquarters experience included (but was not limited to):

- Enforcement litigation as a trial attorney in the Office of General Counsel (OGC);
- Defensive litigation as a trial attorney in the Office of Legal Counsel (OLC);
- Supervisor of appellate writing attorneys in the Office of Review and Appeals
- Director of OFO division responsible for "conflict of interest" complaints; and
- Senior policy advisor to two EEOC Commissioners.

33.     Plaintiff had been repeatedly recognized, within and outside of EEOC, for her sustained commitment to excellence and substantive expertise -- particularly with regard to applying employment nondiscrimination laws in the federal sector context.

34.     Plaintiff's performance had been rated "outstanding" every year since 1982 -- however, that would change in and after 2012.

35.     In  2012, Plaintiff held the position of Senior Legal Advisor in OFO.  She reported to OFO Director Carlton Hadden.

36.     OFO is the EEOC program responsible for (among other things) processing appeals from agency decisions on the EEO complaints of federal employees and applicants.

37.     OFO's appellate processing results in "final" adjudications by, or on behalf of, the Commission -- a five member body of Senate confirmed Presidential appointees.

38.     As an OFO Senior Legal Advisor, Plaintiff's responsibilities focused on providing legal and policy advice on matters relating to OFO's adjudicatory activities.

39.     Plaintiff's OFO responsibilities also included providing legal and policy advice, as warranted, with respect to the related activities of other headquarters offices, such as OGC, OLC, and the Office of Field Programs (OFP).

40.     Plaintiff's work activities routinely required interacting on legal and policy related matters with officials and staff in OGC, OLC and OFP (among others).

41.      Carlton Hadden did not issue Plaintiff a performance rating for FY 2012, although he issued ratings for that year to other employees on his immediate staff.

42.      Plaintiff specifically incorporates paragraphs 6 through 62 of the Amended Complaint and further avers that a reasonable jury could find that Hadden did not issue Plaintiff a rating because he was aware of her meetings with COO Withers in 2012 and was reluctant to do anything relating to Plaintiff without clearing it with Withers first.

43.     As Chief Operating Officer,  Withers was the second highest ranking management official in EEOC -- second only to the EEOC Chair. She occupied the position from May 2010 until her EEOC departure in November 2014.

### CONDITIONS CULMINATING IN PLAINTIFF'S COERCED DEPARTURE

44.     Plaintiff specifically incorporates paragraphs 62 through 124 of her Amended Complaint and further avers that she was forced to retire, in 2019, because she could no longer tolerate the *heightened* scrutiny and hostility that came her way after she reported EEOC's corrupt and unethical conduct to Withers (and others) in 2012.

45.     Withers used her status to ensure no headquarters official would be held to account for his or her role in *sabotaging* Plaintiff's right to an impartial adjudication of her OPM claims.

46.     The only one punished in that regard was *Plaintiff* --  because she had protested Withers' unlawful attempt to use Plaintiff's need for an accommodation as *leverage* to shield EEOC from liability under Title VII -- and because she continued to protest EEOC's refusal  to require OPM to "cease" the race discrimination that ***EEOC*** found in the ALJ appointment process.

47.      EEOC used its rule-making authority, in 2020, to retroactively "codify" the *choice* it made, in 2005, to accommodate OPM's ongoing discrimination against African American ALJ applicants. *See* 29 C.F.R. § 1614.409 (2020).

48.     Once Withers had set the "tone" in 2012, every COO (and Acting COO) thereafter would oversee (or pretend *not* to see) a malicious "scheme" to: 1) cover up, ***by any means necessary***, EEOC's unethical adjudications of Plaintiff's OPM claims; and 2) terminate, ***by any means necessary***, Plaintiff's EEOC employment and federal career. The scheme would be orchestrated and carried out by the headquarters officials whose corruption Plaintiff had exposed.

49.     While the adverse treatment took various forms, and was carried out by various individuals in varying ways (as it had since 2001), EEOC's singular goal after 2012 was clear and unmistakable; *to cause such stress and discomfort as may be necessary to hasten Plaintiff's EEOC departure under circumstances that would afford her **no** opportunity to see the **_falsified_** records EEOC would send to OPM for her retirement "processing."*

50.     From  2012 until her departure on January, 31 2019, Plaintiff was randomly subjected to predatory mind games, emotional assaults and veiled threats and intimidation -- all at the hands of high level officials and staff in multiple headquarters offices.

51.     In a February 4, 2019 letter to nine senior headquarters officials, Plaintiff lamented that she had become "weary" of  the increasingly aggressive efforts to "bludgeon" her into retiring on terms that would facilitate OPM's ability to abuse her therafter. *See* [28-1] (Plaintiff's response to Robbie Dix's December 12, 2018 notice, *and* January 28, 2019 reminder, of his intention to remove her -- apparently, *even if he had to do it **after** her January 31 departure*).


STATEMENT OF CLAIMS

**FIRST CAUSE OF ACTION**
**(Title VII Claim)**

Plaintiff incorporates paragraphs 1 through 125 of her Amended Complaint and paragraphs 1 through 51 of this Second Amended and Supplemental Complaint, as applicable, and asserts the following: *Defendant violated Title VII by subjecting Plaintiff to a hostile work environment because of her protected activity by virtue of engaging in a long running and increasingly aggressive campaign of mistreatment that culminated in Plaintiff's constructive discharge. Such mistreatment included acts independently violative of the Rehabilitation Act.*

## SECOND CAUSE OF ACTION
### (Rehabilitation Act Claims)

Plaintiff incorporates paragraphs 1 through 125 of her Amended Complaint and paragraphs 1 through 51 of this Second Amended and Supplemental Complaint, as applicable, and asserts the following: *Defendant violated the Rehabilitation Act by refusing to provide Plaintiff a reasonable accommodation and maliciously interfering with her efforts to exercise rights under the Act -- culminating in Plaintiff's constructive discharge.*

PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and provide the following relief:

(i) a declaratory order stating that, at all times relevant to this action, EEOC has acted unlawfully and maliciously towards Plaintiff;

(ii) an injunctive order directing EEOC to immediately correct all inaccuracies, discrepancies and ambiguities in Plaintiff's payroll and personnel records;

(iii) an order permanently enjoining EEOC from attempting to harm Plaintiff in the future because of prior or future protected activity;

(iv) an order awarding Plaintiff back pay to be computed under the Back Pay Act;

(v) an order awarding Plaintiff monetary relief in an amount to be determined at trial for pecuniary and nonpecuniary damages suffered as a result of EEOC's unlawful acts;

(vi) an award of attorney's fees and costs; and

(vii) such other legal and equitable relief as may be justly warranted to further the goals and purposes of Title VII and the Rehabilitation Act.

<u>JURY DEMAND</u>

Plaintiff demands a jury trial on all issues so triable.

Respectfully submitted,

<u>/s/</u>_____

Cassandra M. Menoken, Esq., Plaintiff
131 Tennessee Avenue NE
Washington, D.C. 20002
Tele: (202) 546-7671
Fax: (202) 546-7678
CMMEsqDC@gmail.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CASSANDRA M. MENOKEN, Esquire | ) | |
| | ) | |
| Plaintiff | ) | Civil Action No:  1:16-cv-02480 (RMC) |
| v. | ) | |
| | ) | |
| VICTORIA A. LIPNIC, Acting Chair, | ) | Jury Trial Demanded |
| UNITED STATES EQUAL EMPLOYMENT | ) | |
| OPPORTUNITY COMMISSION, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**AMENDED COMPLAINT**

PRELIMINARY STATEMENT

1.      Plaintiff Cassandra M. Menoken brings this action asserting rights under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* and the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 791, *et seq*.    The action arises from a long running pattern of unethical, abusive and, generally, harmful and unlawful conduct committed by Plaintiff's employer, the United States Equal Employment Opportunity Commission (EEOC).  The conduct was initially rooted in EEOC's demonstrated hostility towards Plaintiff's protected activity against the United States Office of Personnel Management (OPM). The hostility intensified, in and after 2012, as a result of Plaintiff's protected activity against EEOC.  The pattern of unlawful mistreatment of Plaintiff spans more than 15 years; it is continuous and persists to this day.

2.      Plaintiff seeks a declaratory order, permanent injunction and such legal and equitable relief as may be just and warranted to rectify the past, lingering and future effects of EEOC's outrageous conduct.

## JURISDICTION AND VENUE

3. This action is authorized by 42 U.S.C. § 2000e-16(c), 29 U.S.C. § 794(a) and 42 U.S.C. § 1981a. The Court has jurisdiction under 28 U.S.C. §1331. All alleged unlawful acts were committed in the District of Columbia. Venue is thus proper under 28 U.S.C. §1391(b).

## PARTIES

4.    Plaintiff Cassandra M. Menoken is a resident of the District of Columbia. She is employed as an attorney with EEOC where she has worked for more than 35 years.

5.    Defendant Victoria A. Lipnic is Acting Chair and administrative head of EEOC, a federal agency headquartered in Washington, D.C. EEOC is charged with enforcing federal laws proscribing employment discrimination in the private and public sectors. EEOC's responsibilities in the federal sector include providing policy guidance and oversight regarding the government's obligation, as an employer, to ensure its work places are "free from" unlawful discrimination and retaliation. EEOC also functions as an administrative "court" by rendering "final" adjudications on discrimination claims filed by federal employees against their agencies. As a matter of preference -- not law--EEOC renders final adjudications on claims filed by EEOC employees against *other* agencies as well as claims filed by EEOC employees against EEOC.

## ADMINISTRATIVE EXHAUSTION

### *SUMMARY OF EVENTS LEADING UP TO PLAINTIFF'S ADMINISTRATIVE EXHAUSTION EFFORTS*

6.    In early 2012, Plaintiff participated in a series of informal meetings with EEOC Chief Operating Officer (COO) Claudia A. Withers. The meetings were arranged by EEOC's Chief Mediator, per Plaintiff's request, to discuss concerns regarding the process put into place for EEOC's adjudication of Plaintiff's then pending appeals. The appeals were related to *prior* appeals filed by Plaintiff in 2001, involving claims asserted in an EEO complaint filed against OPM in 1994.

2

7. The 1994 OPM matter was extraordinarily contentious, spawning retaliation complaints against OPM and two other agencies in 2001 and 2005. The two other agencies were the Social Security Administration (SSA) and the Department of Health and Human Services (HHS). Appeals emanating from Plaintiff's 2001 and 2005 retaliation complaints were pending before EEOC in 2012.

8. In her meetings with COO Withers, Plaintiff expressed concern that her pending appeals were vulnerable to compromise because their processing was being controlled by headquarters officials unlikely to be impartial. These officials (or their Offices) had been involved in compromising Plaintiff's 2001 OPM appeals.

9. Plaintiff advised COO Withers that a review of relevant agency records would reveal that EEOC's adjudications of Plaintiff's 2001 appeals had been tainted by unethical conduct. Such conduct included (but was not limited to) engaging in *ex parte* contact with OPM officials while the appeals were pending.

10. Plaintiff further advised that, in 2008, OPM admitted to its *ex parte* contact with EEOC, but refused to disclose content and frequency, insisting its communications with EEOC about Plaintiff and/or her appeals are protected from disclosure by the "litigation privilege."

11. COO Withers was further advised in 2012 that Plaintiff decided to raise her "conflict of interest" concerns with the Chair's Office because she had been unsuccessful in efforts to raise the concerns *via* the appeal process.

12. Plaintiff had documented her "conflict" concerns in a 2010 motion in which she urged EEOC to devise a neutral process for her OPM appeals. As of the time of the Withers meetings, Plaintiff's motion had not been acknowledged by EEOC.

13. SSA -- "co-respondent" in one of Plaintiff's pending appeals -- wrote a letter in 2012 demanding that EEOC provide assurances that Plaintiff's employment in EEOC headquarters will

not prejudice its interests in the pending "OPM/SSA" matter. *In less than a week*, EEOC responded

in a letter to SSA describing the care it had taken to ensure Plaintiff would not be in a position to

influence the processing of the OPM/SSA appeal; as of the time of EEOC's expedited response to

SSA, Plaintiff had been waiting *two years* for EEOC to acknowledge ethics concerns raised by her. .

14.     The Chair's Office was required to look into the ethics concerns raised in connection

with Plaintiff's OPM appeals pursuant to the Chair's duty to provide "personal leadership" in

promoting an "ethical culture" within EEOC. See 5 U.S.C. §2638.107 (setting forth ethics

responsibilities of agency heads).

15.     The Chair declined to look into the ethics concerns Plaintiff reported to COO

Withers in 2012.

16.     Plaintiff also raised employment concerns during her 2012 meetings with the COO.

17.     Plaintiff advised that the court proceedings on her 1994 OPM matter had revealed

that EEOC and OPM had one or more exchanges regarding Plaintiff's duties and responsibilities as

an EEOC attorney. Plaintiff noted she had reason to believe EEOC had agreed to monitor Plaintiff's

work activities to accommodate OPM's demand that Plaintiff not be involved in EEOC matters in

which OPM *may* have an interest; as a party or nonparty witness, or in its capacity as the human

capital authority for the federal government.

18.     Plaintiff advised COO Withers that, by engaging in *ex parte* discussions about

Plaintiff's work activities while her OPM appeals were pending, EEOC had inappropriately

"linked" Plaintiff's EEOC employment to her protected activity against OPM.

19.     Given Plaintiff's work responsibilities, the inappropriate "link" required that the

Chair's Office arrange to reassign Plaintiff -- at least temporarily -- to a position less worrisome to

OPM and, as a result, less stressful to her.  It also required the Chair to take affirmative steps to ensure that Plaintiff's appeals would be processed in a fair and impartial manner.

20.     Plaintiff explained to COO Withers that immediate action was warranted because the "link" EEOC had created had taken a serious toll on her health.

21.     By 2012, Plaintiff had been medically treated for depression, acute stress, severe hypertension and "complex" post-traumatic stress disorder.

22.      In a March 2014 "initial" decision on Plaintiff's occupational injury claim, the Office of Workers' Compensation Programs (OWCP) found that Plaintiff had suffered a medically diagnosed "injury" during the period encompassed by her claim (since 2002). That finding must be accepted for all relevant purposes in this civil action. See 5 U.S.C. § 8128.

23.     The informal discussions with COO Withers ended in April 2012 with Plaintiff feeling cautiously optimistic that her "ethics" and "workplace" concerns would somehow be addressed. Plaintiff was naïve and could not have been more wrong.

24.     In the weeks and months that followed, it became increasingly clear that COO Withers had never intended to address Plaintiff's concerns and was less than pleased she had raised them with her.  By the end of November 2012, a message had radiated throughout EEOC headquarters: *Plaintiff was no longer to be treated as a valued employee, but as a potential legal adversary to be stymied at every turn.*

25.     After waiting several months for EEOC to respond to a September 2012 reasonable accommodation request, Plaintiff took steps to pursue administrative claims of discrimination and retaliation against EEOC.

### PLAINTIFF'S FORAY INTO THE ETHICAL MORASS KNOWN
### AS EEOC's INTERNAL EXHAUSTION PROCEDURES

26.     On December 27, 2012, Plaintiff contacted EEOC's Office of Equal Opportunity

(OEO) to request assignment of an EEO Counselor. After a telephone discussion with Plaintiff,

the assigned Counselor conducted a limited factual inquiry into Plaintiff's concerns.

27.     On February 6, 2013, Plaintiff filed a formal EEO complaint asserting claims fairly

summarized as follows: 1) EEOC violated Title VII by subjecting Plaintiff to a 10 year pattern of

hostile and adverse treatment rooted in its antagonism towards Plaintiff's pursuit of discrimination

claims against OPM; 2) EEOC violated Title VII in and after 2012 by subjecting Plaintiff to

hostile and adverse treatment because she reported EEOC's retaliatory abuses to the Chair's

Office; 3) EEOC violated the Rehabilitation Act *and* Title VII in 2012 by interfering with

Plaintiff's efforts to be reasonably accommodated where such interference was an independent

violation of law partially attributable to her protected activity under Title VII; 4) EEOC violated

the Rehabilitation Act *and* Title VII by denying Plaintiff a reasonable accommodation, for no

good reason, where the denial was partially rooted in her protected activity under Title VII.

28.     OEO docketed Plaintiff's complaint as EEOC No. 2013-0010 and thereafter

"accepted" it for investigation.

29.     The investigation of Complaint No. 2013-0010 failed to comport with EEOC's

regulation at 29 C.F.R. § 1614.108.   To date, EEOC has offered no justification for that failure.

30.     In its adjudicatory role, EEOC imposes sanctions against *other* agencies when

they fail, absent good cause, to comply with regulatory requirements; however, EEOC does not

hold itself to the same standard of accountability.

31.     OEO had a duty to ensure Complaint No. 2013-0010 would be investigated in a fair and impartial manner.  OEO engaged in conduct that compromised the integrity of the investigation.

32.     At all times relevant to OEO's processing of Complaint No. 2013-0010, the OEO Director reported to COO Withers.

33.     The OEO Deputy Director interfered with an independent investigator's good faith efforts to develop an impartial factual record on the merits of Plaintiff's claims.

34.     The OEO Deputy Director advised EEOC witnesses that they need not respond to the investigator's attempts to obtain information relevant to Plaintiff's claims.

35.     The investigative record on Complaint No. 2013-0010 is devoid of any statement at all from COO Withers, even though her actions were squarely called into question by the complaint.

36.     EEOC's "exhaustion" procedures for internal EEO matters reflect EEOC's practice of not holding itself to the integrity standard to which EEOC holds the rest of the federal government; evincing the attitude "do as I say, not as I do."

37.     The investigation of Complaint No. 2013-0010 was not completed within the 180 day time frame required by 29 C.F.R. §1614.108 (f).

38.     Plaintiff invoked her right to proceed to the hearing stage of the process when the investigation of her complaint stalled at 290 days due to the failure of EEOC witnesses to cooperate with the independent investigator.

39.     Plaintiff's decision to proceed to the hearing stage required that OEO provide Plaintiff a *complete* copy of the record developed by the independent investigator -- to include all documents generated and received during the investigator's processing of Complaint 2013-0010.

40.    Prior to forwarding the investigative record to Plaintiff, OEO *altered* its contents to create a false impression that the gross deficiencies in the investigation were the fault of the investigator – not EEOC.

41.    Documents facially reflecting the failure of EEOC witnesses to cooperate were *removed* from Plaintiff's "copy" of the investigative record.  It is a violation of the federal criminal code to tamper with an official government record. See 18 U.S.C. §1519.

42.    On September 26, 2014, Plaintiff filed EEO Complaint No. 2014-0039 asserting violations of the Rehabilitation Act after learning that EEOC had disregarded her right to medical privacy as well as her right not to be subjected to unwarranted medical inquiries.

43.    In or around early 2014, EEOC arranged for a stranger, not employed by the government, to repeatedly access and review medical information in Plaintiff's OWCP file.

44.    EEOC did not have a legitimate business justification for repeatedly accessing Plaintiff's OWCP file in 2014.

45.    Plaintiff reported EEOC's abusive behavior to an OWCP hearing officer who, thereafter, directed EEOC to justify its actions in writing.

46.    To date, EEOC has provided no justification or explanation for its unauthorized monitoring of the contents of Plaintiff's OWCP file.

47.    EEOC *continued* to unlawfully access Plaintiff's medical records after Plaintiff complained to OWCP fully aware (and arguably *because*) Plaintiff was upset by it.

48.    In or around December 2014, EEOC consolidated Complaints Nos. 2013-0010 and 2014-0039 and assigned them to "Administrative Judge" Jonathan Kaufmann for adjudication. Mr. Kaufmann was actually a private attorney with whom EEOC had an arrangement whereby EEOC would *pay* him to render judgment on whether EEOC had violated any laws.

49. AJ Kaufmann denied, in summary fashion, Plaintiff's request for the participation of a government ethics specialist to opine on issues relevant to EEOC's handling of Plaintiff's OPM appeals. AJ Kaufmann also denied, in summary fashion, Plaintiff's request that EEOC be sanctioned for OEO's flagrant abuses during the processing of Complaint 2013-0010. In the end, AJ Kaufmann saw no need to have a hearing, no doubt realizing that EEOC would pay him *sooner* without one. He completed his assignment by adopting all of EEOC's arguments (including those at odds with EEOC policy) and entering summary judgment in favor of EEOC.

50. EEOC's rules allow employees of every *other* federal agency to have their EEO claims adjudicated at the hearing stage by a randomly assigned EEOC AJ with *no* ties to either party. EEOC employees are the only federal employees forced to have their claims heard and adjudicated by a *handpicked* private attorney-- *paid* by the agency they have accused.

51. Other agencies bound by employment laws they enforce or administer understand the ethical perils of rendering a binding judgment on their own compliance with such laws; it's why agencies like OWCP and the Merit System Protection Board devised special adjudicative procedures for their own employees to ensure impartiality *in appearance* as well as *practice*.

52. EEOC has a special procedure for adjudicating the discrimination claims of its employees, but EEOC's procedures are designed, in appearance and practice, to minimize the likelihood of a discrimination finding against EEOC.

53. By letter postmarked September 19, 2016, EEOC notified Plaintiff of its "final order" ratifying AJ Kauffman's summary handling of Complaints 2013-0010 and 2014-0039.

54. Plaintiff received EEOC's final order on September 22, 2016 and timely filed the instant civil action on December 20, 2016.

FACTS DEMONSTRATING THE PLAUSIBILITY OF PLAINTIFF'S CLAIMS

***PLAINTIFF'S EEOC EMPLOYMENT***

55.     Plaintiff is a GS-15 Attorney who has worked for EEOC in multiple legal capacities for over 35 years.

56.     Until 2012, Plaintiff's performance had been rated "outstanding" since 1982.

57.     Plaintiff was not given a performance rating in 2012 while other eligible employees were given ratings that year.  To date, EEOC has not explained its decision to treat Plaintiff differently in this regard.

58.     Until 2012, Plaintiff had been repeatedly recognized, within and outside of EEOC, for her sustained commitment to excellence, as well as her expertise in discrimination law and procedure -- particularly in the federal sector context.

59.     At times material hereto, Plaintiff functioned as a Senior Legal Advisor in the EEOC's Office of Federal Operations (OFO).  OFO is the program responsible for (among other things) processing appeals from administrative decisions on the discrimination complaints of federal employees and applicants.  OFO's appellate processing results in "final" adjudications by, or on behalf of, the Commission, which is a five member body.

60.     As an OFO Senior Legal Advisor, Plaintiff's responsibilities focused on providing legal and policy advice on matters relating to OFO's adjudicatory activities.

61.     Plaintiff's OFO responsibilities also included providing legal and policy advice, as requested or warranted, with respect to the related activities of other headquarters offices, such as the Offices of General Counsel, Legal Counsel and Field Programs (OGC, OLC and OFP).  Plaintiff's work activities routinely required interacting on policy related matters with officials and staff in OGC, OLC and OFP (among others).

62.     For reasons unrelated to the quality of her work, Plaintiff's status and level of responsibility were greatly diminished after 2012.  Her role in OFO has essentially been reduced to carrying out discrete assignments randomly given to her under the hope and expectation that interactions with others will be minimal.  Plaintiff no longer participates in policy undertakings and no longer receives outstanding ratings.

### *PROTECTED ACTIVITY INVOLVING OPM*

63.     In 1994, Plaintiff initiated EEO proceedings to challenge systemic race and gender discrimination in the federal Administrative Law Judge (ALJ) program. The 1994 proceeding is referred to herein (and elsewhere in the administrative record) as the "Menoken I" matter.

64.     ALJs occupy "senior pay" level positions and enjoy lifetime tenure and independence in their federal employment.

65.     The Menoken I claims were asserted against OPM because of its lead role in the ALJ program.  Although OPM does not employ ALJs, it controls the application and appointment process, generally functioning as the "gatekeeper" for about 30 agencies that do.

66.     The Menoken I EEO complaint challenged the design and administration of the "1993" ALJ selection process, which included (but was not limited to) the examination OPM "opened" in March of that year.  In the complaint, Plaintiff asserted (among other things) that the selection process had long been riddled with barriers to equal opportunity for qualified African American and female applicants (like her).

67.     When Plaintiff applied in 1993, over 90% of the ALJs in the government were white males.  All women and all minorities *combined* made up *less* than 10% of federal ALJs. The profile had been that way (or worse) since 1946, when the position was created.

**EEOC's Processing of the Menoken I Complaint at the Hearing Stage**

68.     EEOC's regulations afford every complainant a right to request a hearing before an impartial AJ. Pursuant to that right, Plaintiff requested a hearing on her Menoken I claims in or around May of 1995.

69.     Clearly mindful (at least at *that* time) of the need to avoid any concerns or perceptions of partiality, EEOC arranged for an individual outside of EEOC to preside over the Menoken I hearing, which was held in March 2000.

70.     The outcome of the Menoken I hearing was "mixed."  Although EEOC's designated AJ wrongly rejected (or failed to address) most of Plaintiff's arguments, he credited one argument that was sufficient to establish OPM's liability under Title VII.

71.     The AJ ruled that OPM had discriminated against African American ALJ applicants by relying on an invalid examination scoring practice that unlawfully correlated with race. The practice operated as an unnecessary barrier to the ability of African American applicants to be fairly scored on the ALJ examination, where a differential of **$1/100^{th}$ of a point** could determine whether an applicant could be considered for an appointment (or not).

72.     The AJ's finding led to a remedial order in June 2001.  The order directed OPM to "cease" and correct its discrimination against African American ALJ applicants. OPM was also required to notify affected agencies of the finding and refrain from allowing appointments from the ALJ register until corrective steps had been taken with respect to examination scores.

73.     EEOC later acknowledged that correcting OPM's discrimination required an increase in the scores of African Americans on the ALJ Register (to include Plaintiff's).

74.     After OPM took "final action," per 29 C.F.R. § 1614.110 (a), Plaintiff promptly appealed to EEOC.

75.     Plaintiff filed two appeals with EEOC in 2001: one challenging the <u>Menoken I</u> AJ's erroneous rulings and non-rulings on issues of fact and law (the "merits" appeal); the other, seeking EEOC's enforcement of the AJ's June 2001 remedial order (the "compliance" appeal).

76.     OPM began violating the AJ's order soon after he exited the case.

**<u>Hostile and Unethical Processing of the Menoken I Appeals In EEOC Headquarters</u>**

77.     Plaintiff's compliance and merits appeals were filed in August and September 2001 (respectively).  In or around November 2001, EEOC issued a notice advising of a *sua sponte* decision to arrange for special handling.  The decision was directed or approved by the EEOC Chair's Office – if not the Chair herself.

78.     EEOC informed Plaintiff and OPM that the <u>Menoken I</u> appeals had been assigned for initial processing to Reuben Daniels, Director of EEOC's District Office in North Carolina.

79.     Not long after her appeals were referred to Daniels, Plaintiff began to sense a subtle shift in her work environment.  She also began hearing rumors that EEOC and OPM had been communicating about Plaintiff and/or her appeals.  Several years later, the accuracy of the rumors was confirmed when, in response to a discovery request in the <u>Menoken I</u> court proceeding, OPM produced a "privilege log" acknowledging its *ex parte* contact with EEOC while Plaintiff's 2001 appeals were pending.

80.     OPM refused to disclose the content of its communications with EEOC on the asserted ground of "privilege."

81.     In May 2003, EEOC dismissed the <u>Menoken I</u> appeals on facially suspicious grounds, prompting Plaintiff to undertake an internal inquiry into how the appeals had been handled.  The inquiry confirmed Plaintiff's suspicion that her appeals had been compromised.

82.    Daniels never arranged to review the <u>Menoken I</u> record which remained in headquarters the entire time of his <u>Menoken I</u> assignment.

83.    Even though Daniels had not reviewed the <u>Menoken I</u> record, working with OLC and OFO (and others), he arranged for Plaintiff's merits appeal to be dismissed as *lacking* merit.

84     Daniels also arranged for Plaintiff's compliance appeal to be dismissed in May2003 pursuant to a ruling that simply stated EEOC was "reasonably satisfied" OPM had complied with the <u>Menoken I</u> order; nothing else.  Plaintiff did not need to conduct an inquiry to know *that* ruling had no foundation. As of May 2003, no one from EEOC had bothered to direct OPM to submit *evidence* of its compliance, per EEOC's standard practice when compliance is at issue.

85.    Once it became widely known within EEOC that Plaintiff could prove, with certainty, that her OPM appeals had been "fixed," officials and staff in headquarters  (including the "colleagues" with whom she worked) slowly began to "close ranks."

86.    In the ensuing years, Plaintiff's work environment became increasingly uncomfortable because she continued to pursue <u>Menoken I</u> *related* matters in EEOC's process; most notably, retaliation claims involving OPM and its agents, SSA and HHS.  Plaintiff's repeated criticism of EEOC's unethical alliance with OPM caused her to be further isolated in headquarters.

87.    After Plaintiff's encounter with COO Withers in 2012, EEOC's message became loud and clear: *there will be no special arrangement for <u>Menoken I</u> related matters (as in the past); to the extent Plaintiff persists in bringing her OPM matters to EEOC, she does so at her peril because all such matters will be closely monitored and controlled by OFO, OFP, OLC and OGC whose priorities will be to do whatever is necessary to protect OPM and EEOC.*

**Plaintiff's Working Conditions Eventually Became Intolerable**

88.     EEOC's antagonism towards Plaintiff's protected activity against OPM hovered like a "dark cloud" over Plaintiff's working environment for 15 years, causing undue stress and complicating her ability to function at the level she had always been expected to perform. The hostile and secretive nature of the day to day environment was made worse when EEOC randomly used its leverage as her employer to facilitate OPM's retaliatory abuses.  For example:

89.     In or around 2002, *while Plaintiff's OPM claims were pending adjudication*, EEOC and OPM agreed that EEOC would accommodate OPM's demand that Plaintiff's work activities be monitored, creating an ongoing fear in Plaintiff that she was vulnerable to being "set up."

90.     In 2006, *while Plaintiff's OPM claims were pending adjudication*, EEOC joined forces with OPM to coerce Plaintiff into "authorizing" an FBI investigation into her "suitability" for federal employment on the asserted ground that neither agency had a record of a background investigation ever being done in connection with Plaintiff's federal employment. The asserted ground was later shown to be *false*; it was a pretext intended to allow OPM to abusively intrude into Plaintiff's personal life in ways it had been prohibited from doing in the discovery process.

91.     In 2007, *while Plaintiff's OPM claims were pending adjudication,* EEOC joined forces with OPM to attempt to induce Plaintiff to retire under the belief that her OFO position was slated for elimination.  It was later revealed that Plaintiff's position was *not* slated for elimination. EEOC's attempt to induce Plaintiff to retire was a ploy to limit the monetary impact of OPM's potential exposure.

**Retaliatory Abuses Designed To Coerce Plaintiff Into Leaving**

92.     On or about September 11, 2012, Plaintiff emailed EEOC's Disability Program Manager requesting an appointment to discuss Plaintiff's need for a reasonable accommodation.

93.     EEOC's Disability Program is housed in the Office of the Chief Human Capital Officer (hereafter "HR" for simplicity).

94.     Upon learning that Plaintiff had requested a reasonable accommodation COO Withers contacted Lisa Williams, the HR Director, and instructed her to hold off on processing Plaintiff's request until further notice.

95.      Although Plaintiff knew her accommodation request was not being timely processed, four months would go by before she would learn the request had been deliberately delayed per the instructions of COO Withers.

96.     In November 2012, COO Withers arranged for EEOC's Chief Mediator to present Plaintiff a proposal offering to "grant" her reasonable accommodation request on the *condition* that Plaintiff execute a "general release" absolving EEOC of liability with respect to any claims arising from her employment.  At the time, no "claims" had been filed by Plaintiff against EEOC.

97.     Plaintiff was shocked and offended by COO Withers' unlawful attempt to use the reasonable accommodation process to extract legal concessions to benefit EEOC.   Given the COO's awareness of Plaintiff's weakened state, medically and emotionally, a reasonable jury could find the November 2012 "proposal" outrageous and predatory.  Needless to say, it was rejected by Plaintiff.

98.     EEOC failed to process Plaintiff's reasonable accommodation request in accordance with EEOC's written reasonable accommodation policy.  The Disability Program

Manager made no effort to identify an accommodation to mitigate the stress Plaintiff was experiencing carrying out her OFO duties while her OPM appeals were pending in headquarters.

99.     Plaintiff suggested several accommodation options in 2012.  EEOC rejected all of them, offering no alternatives.

100.    Convinced EEOC would not provide a reasonable accommodation unless it received something in return, Plaintiff filed an occupational injury claim with OWCP.  She then went on extended leave in early 2013, with the intent of using a combination of "paid" leave and leave without pay (LWOP) as she waited for OWCP to adjudicate her claim.

101.    In or around February 2013, Plaintiff's supervisor, Carlton Hadden, stopped acting on Plaintiff's LWOP requests. He would not approve or deny the requests; he would simply ignore them completely.  He had no authority to do so.

102.    EEOC has never provided a legitimate nondiscriminatory reason – or any reason at all-- for Hadden's failure to act on Plaintiff's LWOP requests.

103.    In or around March 2013, Hadden stopped "certifying" Plaintiff's time to payroll, which had the effect of preventing Plaintiff from being compensated for the "paid" leave requests she had been submitting.  Hadden had no authority to stop certifying Plaintiff's time to payroll.

104.    EEOC has never provided a legitimate nondiscriminatory reason – or any reason at all-- for Hadden's failure to certify Plaintiff's time to payroll.

105.    The Interior Business Center (IBC) is the entity that handles "payroll" matters for EEOC.  In or around June 7, 2013, IBC informed Plaintiff that there were worrisome anomalies in her payroll account.

106.    The anomalies in Plaintiff's payroll account in 2013 arose from EEOC's refusal to process Plaintiff's leave requests and refusal to certify Plaintiff's time to IBC on a bi weekly basis.

107.    IBC warned Plaintiff that there could be adverse consequences if her payroll records were not immediately corrected. Plaintiff was strongly urged to sensitize EEOC to the importance of timely acting on leave requests and accounting for time on a biweekly basis.

108.    Alarmed by IBC's warning, Plaintiff sent an email to Lisa Williams and Carlton Hadden on June 7, 2013, referencing her conversation with IBC, and asking that Plaintiff 's payroll records be promptly corrected and that her status be properly accounted for going forward.

109.    Neither Williams nor Hadden ever responded to Plaintiff's June 7 email.

110.    On October 28, 2013, Plaintiff received a letter from GEHA, her health insurance carrier.  The letter advised that Plaintiff had been "disenrolled" from her policy and that her benefits had been suspended.  It further advised that her benefits would be terminated, retroactively, unless Plaintiff could prove an error had been made. No further details were provided.

111.     Plaintiff immediately called GEHA to advise of her belief that any problem was likely attributable to EEOC's deliberate mishandling of her leave and payroll records.  Plaintiff was advised that, absent prompt action correcting the matter, GEHA would effectuate the termination.

112.    Immediately after hanging up, Plaintiff sent an email to Williams and Hadden attaching a copy of the GEHA letter.  She, again, asked about EEOC's intentions with regard to straightening out her payroll records, specifically urging that a response be provided "right away."

113.    Once again, Williams and Hadden chose not to respond to Plaintiff.

114.    About a week later, Plaintiff was notified by GEHA (not EEOC) that her insurance had been reinstated.  When asked, the representative said she did not know how the issue had been addressed cautioning that there was no guarantee it had been resolved permanently.

115.    Plaintiff began experiencing heightened anxiety in the wake of the insurance cancelation scare as she tried to brace for the next "shoe to drop," which occurred a few days later.

116. When the 2013 government shutdown ended and Congress authorized employees to be paid, Plaintiff, who had been in pay status when the shutdown began, prepared and submitted her time sheet using codes that enabled her to be paid for the shutdown period.

117. Plaintiff was not, however, paid for the shutdown period because Hadden instructed an OFO timekeeper to access Plaintiff's personal account, without her knowledge or consent, and *change* the "pay" codes Plaintiff had entered to codes corresponding to LWOP. This outrageous action caused Plaintiff to lose **$6000** at a time when she was especially vulnerable financially.

118. EEOC has never offered a legitimate nondiscriminatory reason – or any reason at all-- for its unauthorized "hijacking" of Plaintiff's payroll account and blocking her from getting paid. It was at that point that Plaintiff knew EEOC was determined to force her out.

119. In early 2014, Plaintiff began working on her retirement application, with an eye toward separating by the end of May. After her papers were finalized, and she was scheduled to depart in two weeks, Plaintiff undertook to satisfy debts owed to the government as a result of her extended LWOP.

120. When Plaintiff sought guidance on the procedure for paying government debts, she was told to contact EEOC payroll specialist Tonya Palmer, which she did – or at least *tried* to. Palmer refused to respond to (or even acknowledge) Plaintiff's emails and phone messages. Palmer later told a coworker that, given the circumstances, she preferred not to communicate with Plaintiff.

121. Realizing, once again, that no one in EEOC was willing to help her, Plaintiff called IBC for guidance on the procedure for satisfying government debts. It was then that Plaintiff learned EEOC had never corrected her payroll records and that, as a result, was at risk of losing her health insurance if she proceeded with her plan to retire.

122.     Plaintiff promptly canceled her retirement and returned to work in June 2014 --

against her doctor's advice.

123.     Plaintiff thereafter demanded that EEOC take steps to correct her employment

records.  To date, EEOC has not done so.

124.     Initially insisting Plaintiff's records have always been clear and accurate, EEOC

later modified its stance.  After learning of Plaintiff's plan to retire in 2016, HR pretended to

address Plaintiff's concerns by inserting documents into her Official Personnel Folder that did

nothing but mask its prior abuses.  HR was hoping to "trick" Plaintiff into moving forward with

the 2016 retirement.  Although the plan did not work as expected, HR did succeed in creating a

"catch 22." Plaintiff is now at risk of being seriously harmed whether she leaves EEOC or stays.

### *PLAINTIFF'S LEGAL INJURIES*

125.     At all times relevant to this action, Plaintiff has experienced pain, suffering,

embarrassment, and other emotional trauma, arising from EEOC's unlawful conduct.

### FIRST CAUSE OF ACTION

Plaintiff incorporates paragraphs 1 through 125, as applicable, and asserts that Defendant

violated Title VII by subjecting Plaintiff to a hostile work environment because of her protected

activity against OPM and EEOC and engaging in a pattern of retaliatory mistreatment that includes

"discrete" and "non-discrete" acts as well as acts that independently violated the Rehabilitation Act.

### SECOND CAUSE OF ACTION

Plaintiff incorporates paragraphs 1 through 125, as applicable, and asserts that Defendant

violated the Rehabilitation Act by deliberately interfering with Plaintiff's efforts to exercise rights

under thate Act and refusing to provide Plaintiff a reasonable accommodation.  Defendant also

violated the Act by monitoring, and making public, Plaintiff's confidential medical information.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and provide the

following relief:

(i)      a declaratory order stating that, at all times relevant to this action, EEOC has acted

unlawfully and maliciously towards Plaintiff;

(ii)     an injunctive order directing EEOC to immediately correct all inaccuracies,

discrepancies and ambiguities in Plaintiff's payroll and personnel records;

(iii)    an order permanently enjoining EEOC from attempting to harm Plaintiff in the

future because of prior or future protected activity;

(iv)     an award providing Plaintiff back pay and (as applicable) front pay;

(v)      an award of damages to the maximum extent allowable for Plaintiff's emotional

injuries;

(vi)     an award of attorney's fees and costs; and

(vii)    such other legal and equitable relief as the circumstances warrant.

<u>JURY DEMAND</u>

Plaintiff demands a jury trial on all issues so triable.

Respectfully submitted,

*/s/*
Gary T. Brown, Esquire
D.C. Bar No. 246314
GARY T. BROWN & ASSOCIATES
1050 17th Street NW, Suite 1000
Washington, D.C. 20036
Tele: (202) 393-4900
Fax:  (202) 728-1196
GTBFirm@GaryTBrown.com

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing Amended Complaint was served on Defendant's

counsel, Johnny Walker, Esq, via the Court's ECF Notice system on May 9, 2017.


        /s/_____
Gary T. Brown